Samuel C. Coleman, J.
The basic controversy between plaintiff (Anglo) and the defendant (Transcontinental) relates to clause 3(e) in the agreement of August 12,1960. By that clause Anglo “ (e) Pledges as collateral security to the first party [Transcontinental] all of its rights under its agreement with the first party [Transcontinental] dated October 15, 1959 to cover the third party’s [Anglo’s] performance of its obligations under this agreement. ’ ’
The language is broad and if there were no other factors in the case this clause is broad enough to cover the obligations which Anglo assumed under clauses 3(a), 3(b) and 3(d) of the agreement. Under 3(a) plaintiff was to turn over certain certificates of stock to Transcontinental on the very day of the agreement. Under 3(b) Anglo was to pay Transcontinental $15,000 on the signing of the agreement, the balance (exact amount not then determined) some time thereafter. Under 3(d) Anglo acquired the rights and assumed all of the obligations of Transcontinental under a complicated operating agreement for oil leases in Utah (the Rangely leases). The certificates of stock were not turned over at the time of signing, nor was the $15,000 paid. 0
The day the agreement was signed, two other papers were signed. One was an assignment by Anglo (assignee not described) of royalties from the Rangely leases. The other was a curiously worded document called an escrow agreement, pursuant to which all rights to the Rangely royalties were to be turned over as liquidated damages to Transcontinental, if Anglo, within a few days, failed to pay the $15,000, or to deliver the certificates of stock. The certificates of stock and the $15,000 were turned over within the time fixed.
Anglo’s position is that clause 3(e) is to be limited to the extent of securing to Transcontinental the payment of $15,000 and the receipt of the certificates that accompanied the agreement of August 12. Both conditions having been met, Anglo says the two documents are devoid of any significance now and clause 3(e) has been complied with. Transcontinental’s position is that as the certificates of stock and the $15,000 were not turned over immediately on August 12, as the agreement provided, additional precautions would be required to insure performance. Clause 3(e), according to it, remains in full effect. Although Transcontinental in later correspondence wavered in its position, I think its contention is correct.
The documents were prepared in an atmosphere of hostility and distrust. Because of the circumstances, particularly the distrust of Anglo on the part of Transcontinental, and because *530 of the amounts involved, it is clear to me that Transcontinental was insisting on obtaining certain rights in the Rangely royalties to make sure that plaintiff would discharge all of the obligations it was assuming under the basic agreement of August 12. To that extent the basic agreement is plain. I am also satisfied that, as the certificates of stock and the $15,000 were not immediately available, Transcontinental wished to strengthen its position with regard to these two matters, and so obtained the two additional papers. It would not have signed the August 12 agreement if it had not obtained them. The two papers were given for a limited purpose only and have no bearing on clause 3(e). In no way do they limit that clause which remains fully effective as it reads.
Rut what does Transcontinental have? It says that it has a “lien” on royalties from the Rangely leases and it has attempted to “sell” that “lien”. [Temporary injunction granted, 27 Mise 2d 411.] But it seems to me that it has only certain limited rights with respect to those royalties and that it cannot reach beyond those rights. The situation with respect to the Rangely royalties is as follows: Transcontinental purchased rights in those leases and had agreed to pay Anglo over $600,000 for them, payment to be made' out of royalties as received by Transcontinental. Transcontinental now says that it may “ sell ” to itself or to others Anglo’s right to receive these royalties for an indebtedness which, based on its own testimony, is a little over $50,000. But Anglo did not divest itself of its right to receive royalties, nor did it authorize Transcontinental to deprive it of those rights by conveying to others its rights to receive royalties. It said only that to the extent that Anglo is obligated to the defendant, and it eoncededly is for some amount (at least the “ balance ” over the $15,000 payment called for by the agreement and perhaps more), Transcontinental could retain the royalties due it and set it off against the indebtedness. Anglo agreed only to do what the Transcontinental’s president said it had agreed to do to let the defendant retain royalties up to whatever obligations there may be due from Anglo. Nothing more was agreed to. It was not agreed that Transcontinental could take over to itself the right to receive royalties expected to run beyond a half million dollars. In effect Anglo said: You may retain whatever is necessary to make yourself whole under this agreement. The rest is ours, and you have no power of disposition over it. You have no lien over the rest and you cannot sell it or foreclose our right to it. (Cf. Wheeler v. Newbould, 16 N. Y. 392, 398.)
*531 With this disposition of the principal ground of controversy, I turn to the separate causes of action.
First cause of action: — Anglo asks for a rescission of the August 12 agreement on the grounds (a) that the individuals presuming to act on its behalf had no authority to do so, and (b) being a Canadian corporation it could not accept leases on Government owned oil lands, as these were. The first ground was abandoned as it had to be. As to the second, it is strange for a plaintiff to come into a court of equity and ask for rescission on the ground that because of its own status the agreement it made is illegal. I reject its position, and, in any case, it is altogether probable that only the Government can raise the questions of alienage and its possible consequence (U. S. Code, tit. 30, § 181 et seq.; Code of Fed. Reg., tit. 43, §§ 191.3, 191.4; Manuel v. Wolff, 152 U. S. 505, 511; Isaacs v. De Hon, 11 F. 2d 943, 944).
The second cause of action asks to have the so-called escrow agreement of August 12, 1960 delivered up on the ground that the conditions of the escrow have been complied with. In view of what I have said of the significance of the escrow agreement, and the fact that Transcontinental is making no claim under it, the cause of action is dismissed.
Third cause of action: — This relies upon alleged wrongdoing on the part of an attorney said to be acting on behalf of both parties in the making of the August 12 agreement, that act nullifying the agreement. The attorney’s position was well known to all parties in .circumstances where the interest of these parties at times converged and at other times diverged. There is no basis for the contention and the cause of action is dismissed.
The fourth cause of action relates to alleged breaches by Transcontinental of other agreements, but the fact of those breaches, if they exist, is immaterial here and the cause of action is dismissed.
Fifth and sixth causes of action: — These relate to the so-called “lien” and the right of Transcontinental to foreclose the “lien” or to “sell” it. As I have said, Transcontinental’s rights under the agreement of August 12, 1960 are limited to retaining out of royalties whatever amounts may be due to it for obligations incurred by Anglo under that agreement, but it has no lien, and it can take no steps to enforce any so-called “ lien ”. To that extent the decree will run in Anglo’s favor so far as these two causes of action are concerned.
There is a companion action brought by Tazin Mines, Ltd., against Transcontinental. Tazin, relying upon an assignment *532 to it from Anglo of Anglo’s rights to receive the Bangely royalties, reiterates the contention of Anglo and aslcs for similar relief. It may have that. It also asks for a declaration that its rights are superior to those of Transcontinental. Tazin’s assignment undoubtedly is a valid one, but it was made in consideration of the advances by Tazin to Anglo, advances made in part to enable it to pay at least the $15,000 paid by Anglo to Transcontinental. Indeed, the attorney and representative of Tazin acted for it in the drafting of the agreement of August 12, 10G0. Tazin then took its assignment in November, 1960, with knowledge of Transcontinental’s rights in the August 12 agreement and to the extent of those rights Tazin is subordinated to them. The decree will so provide.